**UNITED STATES DISTRICT COURT FOR THE**

**DISTRICT OF RHODE ISLAND**

**UNITED STATES OF AMERICA** :
:
**v.** : **CRIMINAL NO.** CR 05 80 T
:
: **In violation of 18 U.S.C. §§ 1341 and 1346**
**JOHN A. CELONA** :

**INFORMATION**

The United States Attorney charges:

**Introduction**

At all times material to this Information:

1. From on or about January 2, 1995, through on or about March 9, 2004, defendant JOHN A. CELONA ("CELONA") was a State Senator elected to the Rhode Island General Assembly and served as a member of the Rhode Island Senate Committee on Commerce, Housing and Municipal Government, formerly the Senate Corporations Committee ("Senate Corporations Committee"). From on or about January 2, 2001, through on or about December 11, 2003, he was Chairman of the Senate Corporations Committee. CELONA also served as a member of the Senate Committee on Health, Education and Welfare from on or about January 2, 1995, through on or about June 30, 1999.

2. The Senate Corporations Committee possessed jurisdiction over legislation and matters affecting commerce, for-profit as well as not-for-profit business corporations, including but not limited to, health care providers, health care related insurance companies, and

pharmacies.

3. The State of Rhode Island and its citizens had an intangible right to the honest services of its officials and employees. As an elected public official of the State, CELONA therefore owed the State and its citizens a duty to: (a) refrain from receiving payments and benefits that would (i) improperly affect the performance of his official duties or (ii) influence his favorable official action or inaction and (b) disclose conflicts of interest and other material information in matters over which he exercised influence, authority, and discretion that resulted in his personal gain.

4. The Rhode Island Ethics Commission ("Ethics Commission") was an independent commission created by the State of Rhode Island charged with ensuring that public officials and employees adhered to the highest standards of ethical conduct, respected the public trust and the rights of all persons, were open, accountable, responsive, avoided the appearance of impropriety, and did not use their position for private gain or advantage. In June of 1987, the Rhode Island General Assembly enacted the Rhode Island Code of Ethics in Government ("Code of Ethics"). The Ethics Commission had the authority to investigate violations and enforce its provisions. The Ethics Commission also possessed the authority to issue advisory opinions relating to the requirements under the Code of Ethics. As an elected State official, CELONA was subject to the Code of Ethics.

5. Elected state officials subject to the Code of Ethics, including CELONA, were subject to various prohibitions and requirements. These included, but were not limited to:

a. a prohibition on engaging in any employment which was in substantial conflict with the proper discharge of his duties in the public interest;

b. a prohibition on accepting employment which either impaired the official's independence of judgment as to his official duties, or which induced him to disclose confidential information acquired by him in the course of his official duties;

c. a prohibition on disclosing or using confidential information acquired by him in the course of his official duties for pecuniary gain;

d. a prohibition on using his public office for financial gain for himself or his business or for any family member;

e. a prohibition on soliciting and accepting any gift, loan, political contribution, reward, or promise of future employment based on an understanding that the official's vote, official action, or judgment would be influenced thereby;

f. a requirement that an official file a written statement of conflicts of interest with the Ethics Commission in situations where an official, in the discharge of his duties, might be required to take an action (or refrain therefrom) or make a decision that would result in an economic benefit to the official; and

g. a requirement that an official file an annual financial statement covering a broad range of financial activity, including a list of all sources of occupational income identified by employer, and the source of any gift or contribution of money from any person with a financial interest in any decision being made by the official.

**Scheme to Defraud**

6. From in or about July 1997, through in or about December 2003, in the District of Rhode Island and elsewhere, CELONA, and other persons known to CELONA and the United States Attorney, knowingly devised and intended to devise a scheme and artifice to defraud the State of Rhode Island and its citizens of their intangible right to his honest services and to have those services performed free from deceit, favoritism, bias, conflict of interest and self-enrichment.

**Objects of the Scheme**

7. The object of the scheme was for CELONA to unlawfully enrich himself by obtaining money and gifts from business corporations and corporate executives that had an interest in legislation pending before the Rhode Island General Assembly and the Senate Corporations Committee.

8. It was further an object of the scheme for CELONA to use his public office and authority to benefit the corporations that were paying him money and providing him with gifts.

9. It was further an object of the scheme for CELONA to deceive the State of Rhode Island and its citizens concerning his relationships with those corporations in order to continue to receive money and gifts from corporate sources that had an interest in legislation and matters pending before the Rhode Island General Assembly and the Senate Corporations Committee.

**Manner and Means**

10. It was part of the scheme and artifice to defraud that CELONA had undisclosed and improper conflicts of interest which deprived the State of Rhode Island and its citizens of their intangible right to his honest services in that he obtained money and gifts from corporations and corporate executives that had an interest in legislation and matters pending before the Rhode Island General Assembly and the Senate Corporations Committee.

11. It was further part of the scheme and artifice to defraud that CELONA was influenced and affected in his official actions as a State Senator and Chairman of the Senate Corporations Committee in a manner which benefitted the corporations that were paying him money and providing him with gifts, including but not limited to, using his influence, power and authority:

a. to take official actions and to refrain from taking official actions all to benefit the corporations that were paying him money and providing him with gifts;

b. to influence other legislators to act or fail to act in such a way as to benefit the corporations that were paying him money and providing him with gifts;

c. to provide information, acquired in the course of and by reason of his official duties, to the corporations that were paying him money and providing him with gifts;

d. to influence people and companies doing business with the corporations that were paying him money and providing him with gifts in a manner

intended to financially benefit those corporations.

12. It was further part of the scheme and artifice to defraud that CELONA deceived the State of Rhode Island and its citizens concerning his relationship with the corporations that were paying him money and providing him with gifts by, among other things:

a. failing to disclose conflicts of interest, including to the Ethics Commission;

b. providing false and misleading information to the Ethics Commission;

c. filing false financial statements with the Ethics Commission;

d. seeking advisory opinions from the Ethics Commission based on false, misleading, and incomplete information;

e. making false statements before the Ethics Commission; and

f. making public statements and consenting to the issuance of press releases containing false and misleading information.

**COUNT I**

(Honest Services Mail Fraud - 18 U.S.C. §§ 1341 and 1346)

13. The allegations contained in paragraphs 1 through 12 are incorporated by reference.

**The Medical Center Scheme**

14. A corporation, the identity of which is known to CELONA and the United States Attorney, that operated a Medical Center ("Medical Center"), was a not-for-profit corporation incorporated under the laws of the State of Rhode Island. The Medical Center was the parent company of a hospital facility and was also the sole member and a shareholder in three additional

organizations; a realty corporation ("Realty Corporation"), an extended care facility, and a healthcare facility. In addition, until in or about December 2004, the Realty Corporation was a shareholder that owned a one-half interest in an assisted living facility ("Assisted Living Facility"). Legislation was pending before the Rhode Island General Assembly, and the Senate Corporations Committee, which was of importance to the Medical Center and the Assisted Living Facility.

15. Two persons whose identities are known to CELONA and the United States Attorney, as well as other individuals known and unknown, were employed as executives by the Medical Center ("Medical Center Executives") and participated in this scheme.

16. A person whose identity is known to CELONA and the United States Attorney, as well as other individuals known and unknown, were employed as executives by the Assisted Living Facility ("Assisted Living Facility Executives") and participated in this scheme.

17. In or about July 1997, CELONA approached Medical Center Executives about the possibility of performing services, for which he would be paid, on behalf of the Medical Center.

18. It was part of the scheme and artifice to defraud that on or about February 1, 1998, CELONA began working for the Assisted Living Facility and the Medical Center and began receiving payments from the Assisted Living Facility, which were funded by the Medical Center.

19. It was further part of the scheme and artifice to defraud that on or about June 17, 1998, CELONA and the Assisted Living Facility, entered into a written consulting agreement which was back-dated to February 1, 1998. The agreement provided that CELONA would perform consulting services for the Assisted Living Facility and would be paid by the Assisted

Living Facility even though CELONA, Medical Center Executives and Assisted Living Facility Executives knew that a significant portion of his activities had been, and would continue to be, undertaken on behalf of the Medical Center.

20. It was further part of the scheme and artifice to defraud, that on or about April 6, 1998, CELONA and Medical Center Executives sent a letter to the Ethics Commission stating that CELONA was employed by the Assisted Living Facility to promote services provided to senior citizens. In this letter, the Medical Center requested an advisory opinion regarding the extent to which CELONA, as a State Senator employed by an assisted living facility, could continue to propose, debate and vote on healthcare issues before the General Assembly ("Assisted Living Facility Advisory Opinion").

21. It was further part of the scheme and artifice to defraud that in the April 6, 1998 letter, CELONA and Medical Center Executives failed to disclose that payments had already been made to CELONA by the Assisted Living Facility and failed to disclose that CELONA had been performing services for the Medical Center. Medical Center Executives also failed to disclose that they had been and would be funding the payments made by the Assisted Living Facility to CELONA. In so doing, CELONA and Medical Center Executives misrepresented the true identity of his employer and misrepresented the true nature of the work he would be performing.

22. It was further part of the scheme and artifice to defraud that in or about May 2000, Medical Center Executives informed CELONA that the Medical Center was reimbursing the Assisted Living Facility for the money used to pay him. After learning that the Medical Center was paying him by reimbursing the Assisted Living Facility, CELONA failed to inform the

Ethics Commission that he was being paid by the Medical Center, not the Assisted Living Facility, as had been represented in the April 6, 1998, letter seeking the Assisted Living Facility Advisory Opinion. Continuing thereafter, through December 2003, CELONA did not reveal the true nature of his employment and financial relationship with the Medical Center, and the conflicts of interest it created, to the State of Rhode Island, its citizens and Ethics Commission.

23. It was further part of the scheme and artifice to defraud that from on or about February 1, 1998, through in or about December 2003, CELONA, at the direction of Medical Center Executives and while being paid money by the Medical Center in checks disguised as payments from the Assisted Living Facility, performed numerous tasks on the Medical Center's behalf, including but not limited to:

a. from in or about March 1998 through May 1999, CELONA attempted to influence municipalities to increase the number of ambulance transports directed to the hospital operated by the Medical Center;

b. in or about March 1998, CELONA opposed Senate Bill 98--S 2796, an act which prohibited directors, trustees, or officers from serving on the board of a newly converted hospital;

c. from in or about December 1998 through June 1999, while publically voting in favor of legislation establishing a Cancer Council in Rhode Island, CELONA attempted to influence another legislator to oppose the legislation, including House Bill 99-H 5220;

d. from in or about March 1999 through in or about February 2000, CELONA opposed legislation, including House Bill 2000 H-6809, which

permitted municipalities to collect payments and services in lieu of taxes from certain non-profit organizations such as the Medical Center;

e. from in or about April 2001 through in or about December 2001, CELONA, pressured a company, with a financial interest in matters pending before the Senate Corporations Committee, the identity of which is known to CELONA and to the United States Attorney, to pay money to the Medical Center that Medical Center Executives claimed the company owed to the Medical Center; and

f. on or about August 29, 2003, CELONA held a meeting in the State House office provided to him as Chairman of the Senate Corporations Committee with a Medical Center Executive, and representatives of another company with a financial interest in matters pending before the Senate Corporations Committee, the identity of which is known to CELONA and to the United States Attorney, to pressure that company to negotiate terms of a contract between the company and the Medical Center which were favorable to the Medical Center.

24. It was further part of the scheme and artifice to defraud that from in or about March 1999 through in or about June 2001, CELONA, at the request of an Assisted Living Facility Executive and with the consent of a Medical Center Executive, introduced, amended and supported Senate Bills 99–S 0509, 99–S 0509 as amended, 99-H 6122, 2000–S 3048, and 2001–S 0653 which extended moratoriums on licensing of new nursing facility beds.

25. It was further part of the scheme and artifice to defraud that on diverse dates from in or about March 1998 through January 2004, CELONA, Medical Center Executives and Assisted Living Facility Executives, caused the Medical Center to provide 72 checks to CELONA totaling approximately $260,638.63, which money was disguised as payments by the Assisted Living Facility for consulting services.

26. It was further a part of the scheme and artifice to defraud that CELONA, after learning that the Medical Center was funding the payments he was receiving from the Assisted Living Facility, identified himself as a consultant for the Assisted Living Facility but did not list himself as a consultant for the Medical Center and did not reveal the existence of his financial relationship with the Medical Center, and the conflicts of interest it created, to the State of Rhode Island and its citizens, including on his 2000, 2001 and 2002 Yearly Financial Statements to the Ethics Commission.

**Execution of the Scheme to Defraud**

27. On or about October 2, 2000, in the District of Rhode Island and elsewhere, for the purpose of executing the scheme and artifice to defraud described in Paragraphs 13-26, CELONA did knowingly cause to be placed in an authorized depository for mail matter, a letter from the Assisted Living Facility to the Medical Center requesting a check from the Medical Center in the amount of $3,569.24 so that the Assisted Living Facility could satisfy the commitment to pay CELONA, which letter was to be delivered by the United States Postal Service.

All in violation of 18 U.S.C. §§ 1341 and 1346.

## COUNT II

(Honest Services Mail Fraud - 18 U.S.C. §§ 1341 and 1346)

28. The allegations contained in paragraphs 1 through 12 are incorporated by reference.

### The Pharmacy Scheme

29. A corporation, the identity of which is known to CELONA and the United States Attorney, that operated a retail pharmacy chain ("Pharmacy"), was a for-profit corporation incorporated under the laws of the State of Rhode Island. Legislation was pending before the Rhode Island General Assembly, including the Senate Corporations Committee, which was of importance to the Pharmacy.

30. Two persons whose identities are known to CELONA and to the United States Attorney, as well as other individuals known and unknown, were employed as executives by the Pharmacy ("Pharmacy Executives") and participated in this scheme.

31. It was part of the scheme and artifice to defraud that on or about May 27, 1999, CELONA was approached by a Pharmacy Executive who proposed that the Pharmacy hire CELONA as a consultant. At that time, CELONA knew that approximately seven weeks earlier, he had sponsored and supported Senate Bills 1999 S-0008 and 1999 S-0110, which would allow those with pharmaceutical health insurance benefits to choose their own pharmacy ("Pharmacy Freedom of Choice legislation"). CELONA also knew that the Pharmacy and its Executives opposed Pharmacy Freedom of Choice legislation because they believed that the legislation would have a negative financial impact on the Pharmacy.

32. It was further part of the scheme and artifice to defraud that on or about July 8, 1999, CELONA met with Pharmacy Executives and discussed the possibility of a paid consulting arrangement between CELONA and the Pharmacy.

33. It was further part of the scheme and artifice to defraud that on or about September 23, 1999, at the request of Pharmacy Executives, CELONA mailed a letter to the Pharmacy citing his work as a consultant for an assisted living facility. In the letter, CELONA suggested that the Pharmacy had a poor public relations image with senior citizens because of Pharmacy Freedom of Choice legislation and stated that the proposed consulting agreement was a "relatively inexpensive way to continue to market the Pharmacy, its products and services and provide significant positive results. And as important, it would eliminate any bad perception left over from 'freedom of choice.' "

34. It was further part of the scheme and artifice to defraud that on or about February 10, 2000, CELONA entered into a one-year written consulting agreement with the Pharmacy. Pursuant to the terms of the agreement, the Pharmacy paid him $1,000 per month.

35. It was further part of the scheme and artifice to defraud that CELONA entered into the consulting agreement with the Pharmacy and received payments of money from the Pharmacy with the intent to withdraw his support for Pharmacy Freedom of Choice legislation and to perform other acts to benefit the Pharmacy. Thereafter, he performed acts to benefit the Pharmacy, including but not limited to:

a. on or about March 9, 2000, approximately one month after entering into the consulting agreement with the Pharmacy, CELONA purposely left a Rhode Island Senate hearing prior to any vote being taken on another

Pharmacy Freedom of Choice bill, Senate Bill 2000--S 2774, and did not vote on the bill despite his previous support for, and sponsorship of, Pharmacy Freedom of Choice legislation;

b. on or about June 21, 2001, CELONA was the primary sponsor of Senate Bill 2001--S 0993, an act requiring manufacturers of recalled, withdrawn, or damaged drugs to accept returns of those drugs from distributors, such as the Pharmacy and subsequently voted for the bill to be held for further study at the request of Pharmacy Executives;

c. on or about February 10, 2003, a Pharmacy Executive sent CELONA an e-mail requesting that he sponsor legislation that would allow for "electronic prescribing" and on or about February 13, 2003, CELONA was the primary sponsor of Senate Bill 2003--S 0568, an act that would allow for electronic prescriptions for brand name drugs; and

d. on May 13, 2003, House Bill 2003--H 5478 Substitute A passed in the House of Representatives. That bill would have allowed pharmacies licensed in Canada to obtain licensure from the State of Rhode Island Department of Health ("Canadian pharmacies legislation"). On or about May 22, 2003, a Pharmacy Executive sent CELONA, by facsimile, talking points against Canadian pharmacies legislation. Thereafter, CELONA used this information to oppose Canadian pharmacies legislation on behalf of the Pharmacy.

36. It was further part of the scheme and artifice to defraud that in or about August 2003, a Pharmacy Executive provided CELONA with a complimentary airline ticket, accommodations, meals and entertainment to a charity golf tournament in San Diego, California. At the same time, the Pharmacy Executive told CELONA that the Pharmacy could not continue to pay him under the consulting agreement.

37. It was further part of the scheme and artifice to defraud that on various dates from in or about April 2000 through September 2003, CELONA received 38 checks from the Pharmacy, totaling approximately $45,000, sent to him through the United States Mails.

38. It was further part of the scheme and artifice to defraud that CELONA never revealed the existence of his financial relationship with the Pharmacy, and the conflicts of interest it created, to the State of Rhode Island and its citizens, including on his 2000, 2001 and 2002 Yearly Financial Statements to the Ethics Commission.

**Execution of the Scheme to Defraud**

39. On or about September 25, 2002, in the District of Rhode Island and elsewhere, for the purpose of executing the scheme and artifice to defraud described in Paragraphs 28-38, CELONA did knowingly cause a check from the Pharmacy dated September 25, 2002, in the amount of $1,000 payable and addressed to CELONA, to be placed in an authorized depository for mail matter to be sent and delivered to him by the United States Postal Service.

All in violation of 18 U.S.C. § 1341 and 1346.

**COUNT III**

(Honest Services Mail Fraud - 18 U.S.C. §§ 1341 and 1346)

40. The allegations contained in paragraphs 1 through 12 are incorporated by reference.

**The Health Insurance Scheme**

41. A corporation, the identity of which is known to CELONA and the United States Attorney, that provided health insurance ("Health Insurance Company"), was a not-for-profit corporation incorporated under the laws of the State of Rhode Island as a hospital service corporation. Legislation was pending before the Rhode Island General Assembly, including the Senate Corporations Committee, which was of importance to the Health Insurance Company.

42. A person, whose identity is known to CELONA and to the United States Attorney, as well as other individuals known and unknown, were employed as executives by the Health Insurance Company ("Health Insurance Executives") and participated in this scheme.

43. A corporation, the identity of which is known to CELONA and the United States Attorney, that operated a communications company ("Communications Company"), was a for-profit corporation incorporated under the laws of the State of Rhode Island to provide multi-media production and sales.

44. A person, whose identity is known to CELONA and to the United States Attorney, as well as other persons known and unknown, were employed as executives by the Communications Company ("Communications Company Executives") and participated in this scheme.

45. It was part of the scheme and artifice to defraud that in or about April 2002,

CELONA and a Communications Company Executive approached Health Insurance Executives to propose that the Health Insurance Company sponsor a cable access television program, with which CELONA was to be associated and for which the Health Insurance Company would pay the Communications Company to produce.

46. On or about May 15, 2002, a Health Insurance Executive agreed to the arrangement. At that time, CELONA, Health Insurance Executives, and Communications Company Executives knew that:

a. the Health Insurance Company would be paying the Communications Company;

b. CELONA would benefit from his association with the program; and

c. legislation of importance to the Health Insurance Company was pending before the Rhode Island General Assembly and the Senate Corporations Committee.

47. It was further part of the scheme and artifice to defraud that from in or about April 2002, through in or about December 2003, after Health Insurance Executives agreed to sponsor the cable access television program and after the Communications Company agreed to pay him money from the funds supplied by the Health Insurance Company, CELONA agreed to and did assist Health Insurance Executives by acting to further the Health Insurance Company's position on legislative matters important to the Health Insurance Company, including but not limited to:

a. supporting Senate Bill 2002--S 3034, an act which would provide that insurance carriers could design affordable health benefit plans and could utilize pilot programs to test the effectiveness and market acceptance of

those plans;

b. supporting Senate Bill 2002--S 2643 Substitute A, an act which would amend the Health Care Services – Utilization Review Act, by reducing certain conditions placed on providers, and by allowing for care management and case management of health care services outside the scope of utilization review;

c. supporting Senate Bill 2003--S 0834 Substitute A as Amended, an act which would amend the Small Employer Health Insurance Availability Act to promote rate stability, product availability and coverage affordability;

d. opposing Senate Bill 2003--S 0542, which would require insurers providing health care coverage in this state to provide coverage for prosthetic devices in an amount equal to the benefits provided under federal law to aged and disabled persons; and

e. opposing Senate Bill 2003--S 1100, which would modify the limitations on investments of the assets of a nonprofit dental service corporation.

48. It was further part of the scheme and artifice to defraud that on or about November 17, 2003, after media inquiries had been made regarding CELONA's relationship to the Health Insurance Company and the Communications Company, CELONA sent a letter to the Ethics Commission requesting an advisory opinion in which he stated that he had been asked to undertake a future business activity for a communications company that did not do business with the State of Rhode Island ("The Communications Company Advisory Opinion"). At the time he

requested the Communications Company Advisory Opinion, CELONA knew that over the past year, he had already been paid by the Communications Company, with money that was provided by the Health Insurance Company, and that the Health Insurance Company conducted business with the State of Rhode Island.

49. It was further part of the scheme and artifice to defraud that on or about December 8, 2003, the day prior to CELONA's scheduled appearance before the Ethics Commission, Communications Company Executives and others known to CELONA and the United States Attorney, prepared and issued a press release ("press release") which CELONA reviewed and which falsely stated, among other things, that CELONA:

a. had been asked to assist in developing some concepts for a Rhode Island current events cable television station;

b. conducted some basic exploratory work on that concept;

c. had been reimbursed by the Communications Company for related out-of-pocket expenses; and

d. would be willing to accept a paid retainer for services but that the Communications Company had not made a final decision on whether to go forward with the project.

However, when Communications Company Executives issued the press release, CELONA and Communications Company Executives knew that:

e. the Communications Company had previously entered into an agreement with the Health Insurance Company to produce 12 television shows in which CELONA was to participate and be paid;

f. from in or about December 2002 through November 2004, the Health Insurance Company paid money to the Communications Company;

g. from in or about December 2002 through October 2003, CELONA had received a portion of that money;

h. CELONA did not receive the money for exploratory work on a new concept but had been paid for work previously completed;

i. the money that CELONA received did not represent any out-of-pocket expenses;

j. legislation was pending in the Rhode Island General Assembly and before the Senate Corporations Committee which was of importance to the Health Insurance Company;

k. CELONA had taken official positions on that legislation which was favorable to the Health Insurance Company; and

l. public disclosure of the true facts would be harmful to the Health Insurance Company, the Communications Company, their executives and to CELONA.

50. It was further part of the scheme and artifice to defraud that on or about December 9, 2003, the day the false information contained in the press release was published in a local newspaper, CELONA appeared before the Ethics Commission. Knowing the published information was false, CELONA informed the Ethics Commission that any questions regarding his relationship with the Communications Company had been cleared up by the Communications Company's statement as reported in the newspaper that day. CELONA also falsely informed the

Ethics Commission that he had not yet performed any work for the Communications Company under contract. CELONA claimed that he only performed some minor work for which he was not paid. He also falsely stated that he had not yet accepted a consulting relationship with the Communications Company and that whether or not he would pursue that position would be contingent on the Commission's decision.

51. It was further part of the scheme and artifice to defraud that on various dates from December 2002 through October 2003, CELONA received 12 checks from the Communications Company totaling approximately $13,565.00, which money had been provided by the Health Insurance Company and was sent through the United States Mails.

52. It was further part of the scheme to artifice and defraud that CELONA did not disclose his financial relationship with the Communications Company and the Health Insurance Company, and the conflicts of interest it created, to the State of Rhode Island and its citizens, including on his 2002 Yearly Financial Statement to the Ethics Commission.

**Execution of the Scheme to Defraud**

53. On November 18, 2003, in the District of Rhode Island and elsewhere, for the purpose of executing the scheme and artifice to defraud described in Paragraphs 40-52, CELONA did knowingly cause to be placed in an authorized depository for mail matter a letter from the Ethics Commission acknowledging receipt of CELONA's letter of November 17, 2003, requesting the Communications Company Advisory Opinion, to be sent and delivered by the United States Postal Service.

All in violation of 18 U.S.C. §§ 1341 and 1346.

ROBERT CLARK CORRENTE
UNITED STATES ATTORNEY

KENNETH P. MADDEN
First Assistant United States Attorney

GERARD B. SULLIVAN
Assistant United States Attorney